IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THOMAS WICINSKI, | ) |
| Plaintiff, | ) ) ) |
| | ) No. 12 C 6242 |
| v. | ) |
| | ) Magistrate Judge Sidney I. Schenkier |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security,[1] | ) ) |
| | ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Thomas Wicinski seeks reversal and remand of a final decision by the Commissioner of Social Security, Carolyn W. Colvin ("Commissioner), denying his application for Disability Insurance Benefits ("DIB") (doc. # 11). The Commissioner opposes the motion and seeks affirmance of the decision denying benefits (doc. # 19). For the following reasons, we deny Mr. Wicinski's motion, and affirm the Commissioner's decision.

I.

We begin with the procedural history. On June 3, 2009, Mr. Wicinski filed an application for disability benefits, alleging a disability onset date of November 22, 2008 (R. 123-25). His claim was denied initially and upon reconsideration (R. 70-71). Mr. Wicinski requested a hearing, which was held before an Administrative Law Judge ("ALJ") on February 28, 2011 (R. 84-85, 32). On March 14, 2011 the ALJ issued a decision denying benefits (R. 11-22). Mr.

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Carolyn W. Colvin for Michael J. Astrue as the named defendant.

[2]On October 17, 2012, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (docs. ## 8, 9).

Wicinski's request for an appeal was denied, making the ALJ's ruling the final decision of the Commissioner (R. 1-4). *See Shauger v. Astrue*, 675 F. 3d 690, 695 (7th Cir. 2012).

## II.

We continue with a summary of the administrative record. In Part A, we review the general background and the medical record; in Part B, the hearing testimony of Mr. Wicinski, his wife, and the vocational expert; and in Part C, the ALJ's decision.

### A.

Mr. Wicinski was born October 12, 1958, has a high school education, and lives with his wife, Beverly, her father, and her 20-year-old daughter (R. 36-37, 41). Mr. Wicinski and Beverly were married in December 2010 and at the time of the hearing had been living together for twelve years (R. 44). Mr. Wicinski stopped working on November 17, 2008, because he was laid off (R. 161). He alleges that he became unable to work on November 22, 2008, due to encephalitis, seizures, ringing in his ears, hand tremors, diarrhea, and arthritis (*Id.*). Mr. Wicinski meets the insured status requirements through December 31, 2013 (R. 125).

The medical treatment record is remarkably scant, amounting to just over a dozen pages of treatment notes from his neurologist, Dr. Rakesh K. Garg, from December 2005 through January 2011 (R. 227-36, 243-45). Dr. Garg first saw Mr. Wicinski on December 6, 2005 (R. 235-36). Dr. Garg reported that Mr. Wicinski had been taking anti-seizure medications for many years, but due to a lack of insurance, he had stopped taking his medications seven to eight months prior to the December 2005 appointment (*Id.*). Though Mr. Wicinski had not had a seizure during that time, he now had insurance again and wanted to resume his medication (*Id.*). On December 13, 2005, Dr. Garg ordered an EEG, which was normal, and prescribed Depakote for the seizures (R. 232, 234). In the December 13, 2005 notes, Dr. Garg originally reported that

2

Mr. Wicinski had suffered a seizure two weeks before, but the "two weeks ago" reference is circled with a handwritten note that states, "1/16/06 – 9 pm mistake – seizure 1 ½ years ago" (R. 232).

Although the December 13, 2005 treatment notes reflect that Dr. Garg recommended that Mr. Wicinski return in six months for follow up, the next note in the record is a handwritten entry by Dr. Garg on the December 13, 2005 typed page, which is dated November 16, 2006 (R. 232). The entry states "11/16/06…visit. Doing well. No side effects of med. No seizure during last six month – No new problem" (*Id.*). The note also states that Dr. Garg advised Mr. Wicinski to continue the Depakote (*Id.*)

The next entry in the record is a handwritten note from Dr. Garg dated July 2, 2007 (R. 231). The note states "[Illegible] visit. Doing well. No side effects from med – No seizure" (*Id.*) At that time, Dr. Garg continued Mr. Wicinski on Depakote at "1500/day" and suggested that he return for a follow up visit in six months (*Id.*). But Mr. Wicinski did not return to Dr. Garg for more than a year and a half. On March 2, 2009 (three months before Mr. Wicinski filed his disability application, Dr. Garg wrote a letter "To Whom It May Concern," stating that he was treating Mr. Wicinski for a seizure disorder and was prescribing Depakote (R. 230). He wrote that his March 2, 2009 exam was "essentially normal," and Mr. Wicinski had not had any seizures since his last visit in July 2007 (*Id.*). Dr. Garg also stated that Mr. Wicinski "denies any other medical problems other than some ringing in the ears which he feels that the Depakote may be a part of the problem, but he has no hearing problems or any dizziness" (*Id*).

In August 2009, Dr. Garg completed an "Epilepsy Report," which stated that Mr. Wicinski's seizures were "under control" and he had not had a seizure in the last three to four

3

years, though Dr. Garg advised that Mr. Wicinski not work around dangerous machinery, drive commercial vehicles, or climb ladders or scaffolding (R. 227-29).

Also in August 2009, in connection with Mr. Wicinski's application for disability benefits, a state agency medical consultant, Dr. George Andrews, completed an "Illinois Request for Medical Advice" ("IRMA"), for which he reviewed the medical record and concluded that disability benefits should be denied because Mr. Wicinski's seizures were non-severe (R. 237-39). Dr. Andrews noted that the seizures were controlled with medication, and that Mr. Wicinski had not had a seizure in three to four years (R. 239). In November 2009, another state agency medical consultant, Dr. Henry Rohs, also reviewed the record and completed an IRMA, in which he affirmed Dr. Andrews's conclusion (R. 240-42).

On October 27, 2009, Mr. Wicinski filled out a "Function Report – Adult" recording his daily activities (R. 192). He stated that he took care of his personal hygiene, did yard work, mowed the grass, cleared snow, prepared meals daily, watched televised sports games with friends, read the paper, and went shopping for his food and clothing (R. 192-99). Mr. Wicinski reported that when he reads written instructions he has to read them "over and over," and that he has difficulty hearing due to the ringing in his ears, and difficulty seeing because his vision cannot be fully corrected due to his encephalitis (R. 197).

On September 3, 2010, Dr. Garg wrote another "To Whom It May Concern" letter, stating that he had seen Mr. Wicinski in April 2010 and at that time changed Mr. Wicinski's Depakote ER dosage from 1500 mg once a day to 750 mg twice a day, because Mr. Wicinski was "having some tremors" and believed it was due to the Depakote (R. 243). Dr. Garg stated that at Mr. Wicinski's September 2010 visit, he prescribed the twice-a-day dosage for Depakote (*Id.*). Dr. Garg also wrote that Mr. Wicinski could not find a job, and his only suggestion was to

4

"get something in writing to his employer if he has a seizure at work and injury related to the seizure that he will not hold them liable" (*Id.*). Dr. Garg's letter did not state that Mr. Wicinski had reported any seizures since the April 2010 visit, or indeed, since the August 2009 letter in which Dr. Garg had reported that Mr. Wicinski had not had a seizure in three to five years.

In a December 2010 "To Whom It May Concern" letter, Dr. Garg reported that Mr. Wicinski had one "small partial seizure" in the previous three months; otherwise, the medication had his seizures under control (R. 244). In January 28, 2011, Dr. Garg wrote a letter concerning Mr. Wicinski's Social Security application, which stated in part:

> His last office visit was December 10, 2010 and he complained he had a small staring spell in the last three months or so otherwise his seizures are pretty much under control. As far as his driving in the State of Illinois he can not drive for six months and after that it is between him and his employer if they will let him go back to work or not it would be at their risk and most employers will not accept that liability. If for some reason he is not allowed to go back to his previous work which is a truck driver[3] he is perfectly capable of doing any kind of office work. As long as his seizures are under control there is nothing else that needs to be done at this time and we can see him back as needed.

(R. 245).

**B.**

On February 28, 2011, a hearing was held before the ALJ at which Mr. Wicinski was represented by counsel and he, his wife, and a vocational expert testified (R. 32-69). Mr. Wicinski testified that he began having seizures at the age of eight, and since then he has experienced grand-mal (convulsive) seizures, as well as catatonic (staring) seizures (R. 48-49). He has no memory of his seizures, rather his wife will tell him afterwards that he had one (R. 42). He has been on approximately the same dose of Depakote, as prescribed by Dr. Garg, since 2006, though he claims that the medication is not effective (R. 42). He testified that he has

---

[3] Mr. Wicinski has never been a truck driver (doc. # 12: Plaintiff's Memorandum in Support of Summary Judgment ("Pl.'s Mem.") at 6 n.5).

5

convulsive seizures about once a year, and his last convulsive seizure was in May 2010 (R. 49). He also stated that in the last few years his catatonic seizures have become more frequent, particularly since 2008, and he currently has catatonic seizures a couple times a month (R. 42-43, 52). Plaintiff testified that his most recent catatonic seizure was two weeks before the hearing (R. 42).

Mr. Wicinski explained that he had not told his doctor about his catatonic seizures because the doctor was not concerned about those types of seizures (R. 43). Additionally, he avoided mentioning his seizures because he worried that his driver's license would be suspended, which would make it more difficult for him to work (R. 45). Mr. Wicinski's license had been revoked for six-month periods due to seizures in 2004 and 2006 (R. 53-54). In October 2010, he had allowed his license to expire, explaining that he no longer thought it was safe for him to drive (R. 54).

Mr. Wicinski had worked as a chemical machine operator from approximately 1978 until late 2004 (R. 51). He testified that in 2004, he had a convulsive seizure while at work, fell and hit his head, and had to get staples for the lacerations in his head (R. 51-52). He stated that he had not informed his employer that he had a seizure disorder and was fired (R. 52). He then worked as an extruder machine operator and a warehouse laborer until October 2007 (R. 65, 174, 176-177). Most recently, from October 2008 until November 2008, he worked as a welder (R. 51, 174-175). In November 2008, he was laid off because the company had cut back on work (R. 41-42, 51).

Mr. Wicinski testified that he has trouble reading, writing, and concentrating because of the ringing in his ears, but the main reason he cannot work is because he is afraid he will have a seizure, and hurt himself or someone else, particularly if he is around machinery (R. 47-48). He

also does not believe any employer would want to hire him once he discloses that he has a seizure disorder, or that he is on anti-seizure medication (R. 46, 199).

Plaintiff's wife, Beverly, then testified. Though the couple had been married for only a few months, she has lived with Mr. Wicinski for the last twelve years, and stated she commonly witnesses his seizures (R. 56). She stated that he has grand mal seizures annually, and in May 2010, her father and daughter witnessed his most recent grand mal seizure (R. 56-57). She also testified that he has catatonic seizures a couple times a month in which he "goes blank" for 30 seconds to three minutes, and those seizures have become more frequent in the last few years (R. 57-59). When asked about the discrepancy between her account and Dr. Garg's notes, she explained that the doctor did not seem interested in the catatonic seizures, so they would only tell him about the grand mal seizures (R. 61-62). They did not tell Dr. Garg about all of the seizures because she said the last time they had told him about a catatonic seizure, Dr. Garg had just said, "That will happen" (R. 62).

The vocational expert ("VE") testified next. The ALJ first asked about a hypothetical claimant of the same age, education, and experience as Mr. Wicinski, who had no exertional limitations, but would be limited to no ropes, ladders, or scaffolds, would need to avoid even moderate exposure to unprotected heights and moving machinery, and could not operate any vehicles (R. 66). The VE responded that this would eliminate the plaintiff's prior work as a warehouse laborer, chemical operator, or extruding machine operator, but he could work as a production welder (R. 66-67). The ALJ then further limited the hypothetical to only sedentary exertion and included all the other previous limitations (R. 67). The VE opined that this eliminated all of the plaintiff's previous employment, and he would have no transferable skills from that employment (*Id.*). However, there would be an ample number of jobs available in the

7

state that he could perform (*Id.*). In response to a question from Mr. Wicinski's attorney, the VE explained that these jobs would not be available to someone who would have to miss two or more days of work, or only be on task 80 percent of the day (R. 67-68).

## C.

On March 14, 2011, the ALJ issued a written opinion finding Mr. Wicinski not disabled and denying him benefits (R. 11-22). In evaluating his claim, the ALJ applied the five-step sequential process detailed in 20 C.F.R. § 404.1520(a)(4) (R. 17-22). The process requires the ALJ to consider whether: (1) the claimant has engaged in any "substantially gainful activity" since the alleged disability onset date; (2) his impairment or combination of impairments is severe; (3) his impairments meet or medically equal any impairment listed in Appendix 1 of the regulations; (4) his residual functional capacity ("RFC") prevents him from performing past relevant work; and (5) his RFC prevents him from performing any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4), (b)–(f). The claimant bears the burden of proof at Steps 1 through 4, after which the burden shifts to the Commissioner at Step 5. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

At Step 1, the ALJ found Mr. Wicinski had not engaged in substantial gainful employment since November 22, 2008 (R. 17). At Step 2, he found that Mr. Wicinski had a severe impairment of seizures (*Id.*). Though Mr. Wicinski had claimed other impairments such as encephalitis, ear ringing, hand tremors, diarrhea and arthritis, the ALJ found there was either no medical evidence to support these impairments, or that they were under control (*Id.*). Though Mr. Wicinski claimed the ear ringing affected his concentration and hearing, the ALJ found that there was no evidence the ringing caused any daily limitations, and he had heard without difficulty during the hearing (*Id.*).

8

At Step 3, the ALJ considering listings 11.02 and 11.03, but found there was not evidence to support that Mr. Wicinski's disorder met the severity or frequency of seizures as required by those listings (*Id.*). The ALJ then determined that Mr. Wicinski had the residual functional capacity to "perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant cannot climb ladders, ropes, or scaffolding and must avoid exposure to unprotected heights and moving machinery. The claimant is unable to operate any motor vehicle" (*Id.*).

The ALJ reviewed Mr. and Mrs. Wicinski's testimony, noting that each had claimed Mr. Wicinski was having grand mal seizures once a year and catatonic seizures a couple times a month (R. 18-19). The ALJ reported that when he confronted the Wicinski's with the conflict between their description of increased seizure activity and the treatment record, which showed that Mr. Wicinski's seizures were under control, Mr. Wicinski explained that he had not told his doctor about the seizures for fear of not being able to work, for fear he would lose his driver's license, and that when he had told his doctor about his seizures, Dr. Garg was "not concerned about them" (*Id.*). The ALJ next reviewed the medical record, quoting several of Dr. Garg's notes, which stated that Mr. Wicinski had reported no seizures while under his care, other than a small partial seizure in September 2010 (R. 19).

The ALJ disbelieved the testimony of Mr. Wicinski and his wife regarding the frequency of his seizures and afforded their testimony "little weight" (R. 19-20). Mr. Wicinski had repeatedly told Dr. Garg that he was not having any seizures, including neglecting to inform him of the alleged convulsive seizure in May 2010, and the ALJ explained why he rejected Mr. Wicinski's explanation of this omission:

> The proffered rationale for this willful withholding of important medical information revolved around the claimant having his driver's license potentially

> suspended if the doctor was made aware of how often and how intense his seizures truly were. This justification is entirely unpersuasive and completely incredible given the fact that the claimant let his driver's license expire on his own, as he failed to renew the same. It stands to reason then, if the claimant were truly experiencing multiple seizures each month *after* he allowed his driver's license to expire, then he would have reported this increase in seizure activity to his doctor so that his condition could be properly treated, pharmaceutically or otherwise. This claimant did not so inform his physician.

(R. 19) (emphasis in original). The ALJ also observed that Mr. Wicinski had not received "the type of treatment one would expect from a totally disabled individual" (*Id.*).

Additionally, the ALJ noted that plaintiff had been working as a welder in October and November 2008 and had been laid off due to economic reasons, rather than because of his medical condition (R. 20). He had received unemployment during 2009, all that time claiming to the unemployment agency that he was willing and able to work, and was actively searching for a new job (*Id*). The ALJ also concluded that Mr. Wicinski's description of his daily activities did not suggest that he was impaired in any way, since he could cook meals, do yard work (mowing and snow removal), manage his finances, and watch television with his friends (*Id.*). Thus, the ALJ concluded that his "active lifestyle certainly does not reflect the disposition of a totally disabled individual" (R. 20).

The ALJ afforded "significant weight" to Dr. Garg's medical notes and opinions, since he was the only treating physician on record (R. 21). The ALJ carefully analyzed Dr. Garg's January 28, 2011 letter, in which the doctor observed that if "for some reason" Mr. Wicinski could not return to his work as a "truck driver," he was still "perfectly capable of doing any kind of office work" (R. 20, referring to R. 245). The ALJ explained that Dr. Garg had not said that Mr. Wicinski could not return to his prior work, or that his seizure disorder limited him to sedentary work, but only that an employer would have to accept liability if Mr. Wicinski were to operate a vehicle (R. 20).

Several of Mr. Wicinski's friends and family members had submitted "seizure description forms," which the ALJ afforded "little weight" (R. 21, 171-73, 211-13). The ALJ elected to discount them because they reported a level of seizure activity that was not substantiated by the medical evidence (R. 21).

The ALJ also noted that the state agency doctors, after reviewing the medical record, recommended Plaintiff be found not disabled, as his medication fully controlled his seizures (R. 21). Though the agency doctors concluded that his condition did not restrict his ability to perform any kind of work, the ALJ determined that because Mr. Wicinski had a controlled seizure disorder certain limitations in the RFC were warranted, such as that "the claimant cannot climb ladders, ropes, or scaffolding and must avoid exposure to unprotected heights and moving machinery... [and] is unable to operate any motor vehicle" (*Id.*). Beyond those non-exertional limitations, the ALJ found that Mr. Wicinski had the RFC to perform "a full range of work at all exertional levels" (R. 17).

At Step 4, the ALJ found Mr. Wicinski was able to return to his past work as a production welder, consistent with the testimony of the VE, and therefore he was not disabled under the Act (R. 21-22). Because the ALJ found that Mr. Wicinski was not disabled at Step 4, he was not required to and did not proceed to Step 5.

### III.

We must uphold the ALJ's decision if supported by "substantial evidence," which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). The ALJ "must build a logical bridge from the evidence to his conclusion, but need not provide a complete written evaluation of every piece of testimony and evidence." *Id.* A reviewing court will not "displace

11

the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations," but "must do more than merely rubber stamp the ALJ's decision." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). If the ALJ ignores entire "lines of evidence" that do not support his conclusion, or fails to articulate why relevant evidence has been rejected, the decision must be remanded. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

Mr. Wicinski contends that the ALJ erred in determining his RFC and in concluding, at Step 4, that he could return to his prior work as a production welder (doc. # 12: Plaintiff's Memorandum in Support of Summary Judgment ("Pl.'s Mem.") at 5-9). For the reasons stated below, we disagree and find that substantial evidence supports the ALJ's decision.

### A.

We first address Mr. Wicinski's argument that the ALJ erred in determining his RFC. The ALJ found that Mr. Wicinski had the residual functional capacity to perform a "full range of work at all exertional levels but with the following nonexertional limitations: The claimant cannot climb ladders, ropes, or scaffolding and must avoid exposure to unprotected heights and moving machinery. The claimant is unable to operate any motor vehicle" (R. 17).

In determining Mr. Wicinski's residual functional capacity, the ALJ first addressed the conflict between the Wicinskis' testimony regarding increased seizure activity and the evidence from the medical record which showed that Mr. Wicinski's seizure disorder was well-controlled with medication. The ALJ explained in detail why he rejected much of the Wicinskis' testimony about his alleged seizures. For example, the ALJ did not credit Mr. Wicinski's claim that he did not report all of his seizures in order to retain his driver's license, because even after Mr. Wicinski voluntarily let his driver's license expire in October 2010, he still did not report his

alleged increased seizure activity when he saw Dr. Garg in December of 2010 (R. 54, 244). And though Mrs. Wicinski claimed that they did not bother to tell Dr. Garg about catatonic seizures, they never explained why they had failed to tell him about the grand mal seizure Mr. Wicinski claimed to have experienced in May 2010 (R. 18-19, 49). The ALJ found the Wicinskis' claimed justification for withholding information from Dr. Garg "entirely unpersuasive and completely incredible," given that "if the claimant were truly experiencing multiple seizures each month *after* he allowed his driver's license to expire, then he would have reported this increase in seizure activity to his doctor so that his condition could be properly treated" (R. 19) (emphasis in original).

After rejecting the Wicinskis' testimony, the ALJ found that the medical record showed that medications had been "relatively effective in controlling [Mr. Wicinski's] symptoms" (R. 20). Because Mr. Wicinski worked after his alleged onset date as a welder, but stopped only because he was laid off and because there was "no evidence of a significant deterioration in [his] medical condition" since then, the ALJ found that, "[a] reasonable inference, therefore, is that the claimant's impairment would not prevent the performance of that job [welding], since it was being performed adequately at the time of the layoff despite a similar medical condition" (*Id.*). The ALJ also reviewed Mr. Wicinski's daily activities and found that they were "not limited to the extent one would expect of a truly disabled individual" (*Id.*). Finally, after considering both the treatment records and the records of the state agency physicians and other consultants, the ALJ concluded that Mr. Wicinski could perform a full range of work at all exertional levels with certain non-exertional limitations (R. 17, 21).

Mr. Wicinski argues that the ALJ erred in his RFC analysis by failing to properly credit what he describes as Dr. Garg's opinion that Mr. Wicinski's impairments limit him to sedentary

work (Pl.'s Mem. at 6).⁴ In support of this contention, Mr. Wicinski relies on Dr. Garg's January 28, 2011 letter, which states, in part:

> [Mr. Wicinski] had a small staring spell in the last three months or so otherwise his seizures are pretty much under control. As far as his driving in the State of Illinois he cannot drive for six months and after that it is between him and his employer if they will let him go back to work or not. It would be at their risk and most employers will not accept that liability. *If for some reason he is not allowed to go back to his previous work which is a truck driver he is perfectly capable of doing any kind of office work.*

(*Id.* citing R. 245) (emphasis added). Mr. Wicinski elaborates on Dr. Garg's note, explaining:

> Although Dr. Garg did not define the exertional level of "office work," his prior note shows that he is concerned with Tom having a seizure at work and any injury related to that seizure. Generally, we can take notice that office work is done at a sedentary level. The ALJ ignored that Dr. Garg limited the exertional level for safety reasons.

(Pl.'s Mem. at 6). After claiming that Dr. Garg's note establishes Mr. Wicinski's RFC as sedentary, Mr. Wicinski then takes on the ALJ for failing to give proper weight to this supposed opinion.

The ALJ was not persuaded that Dr. Garg's letter expresses the opinion that Mr. Wicinski's seizure disorder limits him to sedentary work (R. 20).⁵ Indeed, the ALJ found that Dr. Garg's letter "tacitly assumes that the claimant is capable of work" and that it is "certainly not a medical prohibition against the claimant's previous work. Nor is the doctor's comment that

---

⁴The regulations define sedentary work as requiring primarily sitting, some walking and standing, and minimal lifting. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a).

⁵Interestingly, the record before us contains an amended version of the January 28, 2011 letter, with the following typed note added at the bottom of the page and signed by Dr. Garg: "Tom has been restricted to sedintary [sic] office work since November 2008. This is to clarify my letter of January 28, 2011; I mistakenly indicated that Thomas was previously employed as a truck driver. He had never been employed as a truck driver" (R. 7). Although the revision is undated, the page has what appears to be a fax date of May 17, 2011, which was after the ALJ's opinion issued. The amended letter was submitted to the Appeals Council with Mr. Wicinski's Request for Review of Hearing Decision/Order, as "new and material" evidence (R. 6). The Appeals Council denied the request for review with no specific comment about the amended letter (R. 1-3). Although it is technically part of the record before us, we do not address it substantively because it was not before the ALJ. *See Rice v. Barnhart*, 384 F.3d 363, 366 n.2 (7th Cir. 2004). In addition, Mr. Wicinski never mentioned or cited this amended letter; hence he has waived any argument based upon it.

the claimant can perform desk work a medical opinion which precludes all other exertional levels of activity" (R. 20-21). The ALJ's reading of the December 2010 note is consistent with Dr. Garg's September 3, 2010 note suggesting that it might facilitate efforts to find work if Mr. Wicinski told employers in writing he would not hold them liable if he had a workplace injury related to a seizure (R. 243). We find the ALJ's interpretation of Dr. Garg's December 2010 letter reasonable and decline to disturb it.

The ALJ supported the RFC determination with other treatment records from Dr. Garg which support the ALJ's conclusion that Mr. Wicinski's seizures are largely under control and have been so for a number of years (R. 19, 230, 227-29, 244). Moreover, on August 13, 2009, Dr. Garg completed an "Epilepsy Report" for Disability Determination Services, which stated that Mr. Wicinski's seizures were "under control – no seizures x 3-4 years," that his EEG findings were normal, and that he had no exertional limitations on "Carrying, Moving about, Lifting, Standing, Walking, or Sitting" (R. 227-29). Nothing in the medical record demonstrates that Mr. Wicinski's condition has deteriorated over time. Consequently, contrary to Mr. Wicinski's assertion that the ALJ "relied on conjecture and his own assessment" in assessing his RFC, we find that substantial evidence in the record supports the ALJ's RFC analysis. Because we affirm the ALJ's RFC of all exertional levels with certain non-exertional limitations, we find no need to address Mr. Wicinski's argument that he should be found disabled under the Medical-Vocational Guidelines.[6]

---

[6] Under these Guidelines, 20 CFR Pt. 404, Subpt. P, App. 2 Rule 201.14, a finding of disabled is directed for an individual between the ages of 50 and 54 who has a high school education, no transferable skills or direct entry into skilled work, who can no longer perform their past relevant work, and who is limited to performing sedentary work.

15

## B.

Mr. Wicinski also contends that the ALJ erred in concluding at Step 4 that he could perform his past relevant work as a production welder. We reject this argument as well. During the hearing, the ALJ presented a hypothetical to the VE addressing Mr. Wicinski's past relevant work:

> Q: I'd like you to assume we have an individual of the same age, education and experience as the claimant. This individual has no exertional limitations. He is limited to no ropes, ladders, or scaffolds. Needs to avoid even moderate expose to unprotected heights and moving machinery. He is unable to operate any moving vehicle. How would these restrictions affect the performance of the claimant's past relevant work?
>
> A: Could not perform [INAUDIBLE] laborer. Could not perform laborer, chemical processing. He could perform production welder. Could not perform extruding machine operator.

(R. 66-67).

Mr. Wicinski's argument on this issue barely warrants discussion. The argument consists mostly of conclusory statements and lacks pertinent legal authority, and so it is waived. *See, e.g., Jordan v. Binns*, 712 F.3d 1123, 1134 (7th Cir. 2013); *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) ("We have repeatedly held that undeveloped arguments are considered waived." (citations omitted)). Waiver aside, we find the ALJ's Step 4 finding supported by substantial evidence for the following reasons.

*First*, if Mr. Wicinski did not believe that the ALJ had adequately included all of his limitations in the hypotheticals, he had the opportunity to cross-examine the VE and to pose additional hypotheticals at the hearing and failed to do so. *See Ragsdale v. Shalala*, 53 F.3d 816, 819 (7th Cir. 1995) ("There currently exists sufficient procedural measures to bring out the vocational expert's thought process. For example, the claimant could question the vocational expert on cross-examination, pose his own hypothetical questions, or request the ALJ pose

interrogatories to the vocational expert"); *Penny v. Astrue*, No. 08-2270, 2010 WL 1931312, at *7 (C.D. Ill. May 13, 2010) ("If a claimant's attorney does not question the basis of the VE's testimony, he forfeits that objection unless the error is apparent"); *see also Leon v. Astrue*, No. 1:11-CV-00268, 2013 WL 796310, at *12 (N.D. Ind. Mar. 4, 2013). After the ALJ finished questioning the vocational expert, Mr. Wicinski's attorney had an opportunity to make inquiries of his own. Yet, Mr. Wicinski's attorney asked only one question of the VE, which concerned only whether Mr. Wicinski could work if he could remain on task only 80 percent of the day (R. 68). Because Mr. Wicinski's attorney "did not question the basis for the vocational expert's testimony, purely conclusional though that testimony was, any objection to it was forfeited." *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004); *see also Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002); *Young v. Astrue*, No. 09-1191, 2010 WL 2572047, at *11 (C.D. Ill. June 23, 2010) ("If there are no questions raised during the hearing about the 'shortcomings in the vocational expert's data or reasoning,' the ALJ may properly credit the VE's testimony without conducting further inquiry").

*Second*, the plaintiff carries the burden at Step 4 of the analysis and must present sufficient evidence to show that he cannot return to his prior work. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). Mr. Wicinski did not carry his burden. Based on the medical evidence, the ALJ could reasonably have drawn the conclusion that Mr. Wicinski's seizures were "well-controlled with medication" (R. 19) and that the hypothetical posed to the VE during the hearing incorporated all necessary impairments and limitations. *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009) ("the ALJ is required only to incorporate into his hypothetical those impairments and limitations that he accepts as credible"); *Stitzer v. Barnhart*, No. 03 C 50275, 2004 WL 1574254, at *20 (N.D. Ill. June 28, 2004) ("If Plaintiff's seizure disorder is controlled

by medication, then why inquire of the vocational expert the hypothetical of a person who suffers petit mal seizures 'a few times a week'").

*Third*, the ALJ properly considered that even though Mr. Wicinski had been dealing with his seizure disorder since he was eight (R. 235), he had actually worked as a welder in 2008, even after his alleged onset date:

> The claimant stated that he worked after his alleged onset date as a welder, but the record indicates that the claimant stopped working due to a business-related layoff rather than because of the allegedly disabling impairments. Further there is no evidence of a significant deterioration in the claimant's medical condition since that layoff. A reasonable inference, therefore, is that the claimant's impairment would not prevent the performance of that job, since it was being performed adequately at the time of the layoff despite a similar medical condition.

(R. 20). Any safety or liability concerns that Mr. Wicinski now raises (in vague, conclusory fashion) seem likely to have existed in 2008 when he originally held a welding position. Consequently, even had Mr. Wicinski articulated and supported this argument adequately, we would find that substantial evidence supported the ALJ's decision on this issue and that the ALJ drew a logical bridge between the evidence and his conclusions.

## CONCLUSION

For the foregoing reasons, we deny Mr. Wicinski's motion (doc. # 11) for reversal and remand and affirm the decision of the Commissioner.

ENTER:

_____
SIDNEY I. SCHENKIER
United States Magistrate Judge

DATE: August 19, 2013